UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| F5 NETWORKS, INC., | CASE NO. C10-654MJP |
| Plaintiff, | ORDER ON CLAIM CONSTRUCTION (PART 2) |
| v. | |
| A10 NETWORKS, INC., | |
| Defendant. | |

The Court, having received and reviewed:

1.  Defendant A10 Networks, Inc.'s Opening Claim Construction Brief (Dkt. No. 99)

2.  Plaintiff F5 Networks, Inc.'s Rebuttal Claim Construction Brief for F5 Patents (Dkt. No. 107)

3.  Plaintiff F5 Networks, Inc.'s Opening Claim Construction Brief for F5 Patents (Dkt. No. 101)

4.  Defendant A10 Networks, Inc.'s Responsive Claim Construction Brief (Dkt. No. 105)

and all attached declarations and exhibits, makes the following ruling:

This claim construction opinion construes the disputed terms in four interlocking patents. Plaintiff F5 Networks, Inc. ("F5" or "Plaintiff") has accused Defendant A10 Networks Inc. ("A10" or "Defendant") of infringing on a multitude of claims covering all patents. The parties submitted a lengthy list of terms to be construed which, for purposes of judicial economy and efficiency, the Court divided into two parts, the second of which is addressed by this order. For the reasons stated herein, the Court adopts the constructions set forth in the *Claim Construction* section of the order *infra*.

**Background**

Each single communication over the internet (an e-mail, an order to an internet retail website, a click on a link from one webpage to another, etc.) is broken into a series of "packets" of data; the communication is disassembled as it leaves the "source" computer and reassembled at the "destination" computer. The patents at issue concern methods for distributing packets of data to a multitude of computer devices called "traffic managers" using the source and/or destination information in each packet in a way that insures that each packet in a "flow" of packets (a single communication string) is sent to the same traffic manager. There are four interlocking patents – U.S. Patent No. 7,102,996 (the "'996 patent"); U.S. Patent No. 7,697,427 (the "'427 patent"); U.S. Patent No. 7,395,349 (the "'349 patent"); and U.S. Patent No. 7,702,809 (the "'809 patent").

The provisional applications for these patents were filed in May 2001. The non-provisional applications were filed between 2002 and 2007, during which time they were under examination by the Patent and Trademark Office ("PTO"). The patents were issued between 2006 and 2010. Following the filing of this lawsuit, A10 requested reexamination of the F5

1   patents.  Following an initial reexamination process, the PTO denied each of A10's requests.  *See*

2   Dkt. No. 106-14 and 106-20 for reexamination denials of the '427 and '809 Patents.  A10 has

3   petitioned the PTO to overturn the denials, alleging that the examiner "ignore[d] the prosecution

4   history, applied[d] the wrong legal standard, mischaracterize[d] the cited art, and adopt[ed] a

5   claim construction that is significantly narrower than the construction asserted by the Patent

6   Owner."  Fisher Decl., Ex. B.  That appeal is pending and the Court regards the reexamination

7   process as "unconcluded" at this point.

8

9   **Analysis**

10  *Principles of Construction*

11          In construing a claim term, courts should look first "to the words of the claims

12  themselves… to define the scope of the invention."  <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90

13  F.3d 1576, 1582 (Fed. Cir. 1996).  Generally, claim terms are accorded their "ordinary and

14  customary meaning" (<u>Id.</u>), which is defined as the meaning that the terms would have to a person

15  of ordinary skill in the relevant art at the time of the invention.  <u>Phillips v. AWH Corp.</u>, 415 F.3d

16  1303, 1313 (Fed. Cir. 2005). In determining the meaning of a claim term under that standard,

17  courts are permitted to consider any "intrinsic evidence," which includes (1) the claims (which

18  "provide substantial guidance as to the meaning of particular claim terms;" <u>Id.</u> at 1314); (2) the

19  specifications (the "single best guide to the meaning of a disputed term;" <u>Vitronics</u>, 90 F.3d at

20  1582; and (3) the prosecution history.  The claims must be read in view of the specifications

21  (<u>Phillips</u>, 415 F.3d at 1315), but the Court is not permitted to import or "read limitations" from

22  the specifications into the claims.  <u>Id.</u> at 1323.

23

24

It is also permissible to consider "extrinsic evidence" – any evidence outside the patents themselves and their prosecution history (e.g., expert or inventor testimony, dictionaries and treatises). Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995)(*en banc*). When intrinsic evidence unambiguously describes the scope of a patented invention, however, reliance on extrinsic evidence is improper. Vitronics, 90 F.3d at 1583.

*Claim Construction*

**Claim Term 5.1 ("hashing [the source address /destination address] to obtain a value that is then used to distribute[/forward] the packet [to the first traffic manager]/[to a particular traffic manager]"):** *applying a function to map the source[/destination] address, but without mapping the destination[/source] address, to an integer output that is used to select the first [/target] traffic manager, and then sending the packet to the selected traffic manager*

The Court adopts a slightly modified version of Defendant's proposed construction of this Claim Term. Defendant's construction seeks to differentiate between a "first/second function or algorithm." In support of this it cites the report of its expert, who relies exclusively on the reexamination decision to corroborate his conclusion that the term is properly construed by distinguishing between the algorithm used on the source address and the algorithm used on the destination address. Dkt. No. 100, Ex. 1, Jaffay Report, pp. 40-41. The Court has previously ruled the reexamination findings inadmissible as intrinsic evidence.

At oral argument, Defendant presented evidence that the specifications consistently refer to the algorithm hashing on the source address and hashing on the destination address. *See*, e.g., '996 Patent at FIG.9; '996 Patent at 17:47-56. A10 insists that these represent two different hash algorithms, but the Court is not convinced. The Court reads the specifications as disclosing an

1  algorithm hashing on two different addresses, not as two different algorithms, and has fashioned

2  its construction accordingly.

3      The Court adopts the phrase "but without mapping the destination[/source]  address" to

4  represent its understanding that the function/algorithm uses the source or destination address but

5  not (as Plaintiff argues) the source and/or destination address.  Plaintiff cites to language in the

6  specifications which it claims "expressly state that hashing can be performed on source *and/or*

7  *destination addresses*" (Pltf Opening Brief, p. 15; emphasis in original), but the Court is mindful

8  that a construction must not rely on specification language that is broader than the claim

9  language (Unique Concepts, Inc. v. Brown, 939 F.2d 1558, 1562 (Fed. Cir. 1991)).  Nowhere in

10 the claim language does it state anything other than that the hashing is done on the source or the

11 destination address.  The Court also relies on the evidence of Plaintiff's own expert, who stated

12 in his report that a single address (source or destination) is the "determinative factor" in the

13 hashing process.  Dkt No. 100-2, pp. 18, 19.

14      Defendant's construction again interjects the phrase "through the computer

15 network" which represents its position that Plaintiff's patents should be restricted to a process

16 involving a networked series of stand-alone devices.  As in the previous claim construction

17 order, the Court finds that Defendant is importing a limitation from the specifications which is

18 not found in the claim term itself, and declines to adopt that portion of A10's proposal.

19

**Claim Term 5.2  ("hashing at least the first field in the received packet to obtain a hash key**
20
**and employing the hash key to select the target traffic manager to which the received**
21
**packet is forwarded"):** *applying a function to map at least the first field in the received*
22
*packet to an integer output that is used to select the first [/target] traffic manager, and then*
23
*sending the packet to the selected traffic manager*
24

The Court is mindful of the rule that "different claim terms are presumed to have different meanings." Board of Regents of the University of Texas System v. BENQ America Corp., 533 F.3d 1362, 1371-1372 (Fed. Cir. 2008). Although it is a rebuttable presumption, "[i]n the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings." CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co., 224 F.3d 1308, 1317 (Fed. Cir. 2000).

The only significant difference between Claim Terms 5.1 and 5.2 is 5.2's use of the phrase "the first field in the received packet." Defendant attempts to establish that "field" and "source/destination address" are interchangeable terms, but its only support for this argument comes from the reexamination decision. There is no support for the argument in the claim language or specifications. The '349 Patent is replete with the use of the term "field" (*see generally,* '349 Patent), and the specifications disclose hashing on fields that are not the "source/destination address." *See*, e.g., '349 Patent, 12:10-12 ("… a hash is performed on the source IP address, destination IP address, and the 8-bit protocol field"). Therefore the Court presumes that this phrase connotes a different meaning and construes this term by substituting "first field *etc*…" for "source/destination address."

**Claim Term 5.3** (**"determine[] the corresponding traffic manager based in part on hashing either source information or destination information in each received packet to determine a hash key usable as an index into an allocation table of traffic managers"**): *Select one of the multiple traffic managers based in part on applying a function for mapping a set of input values to a smaller set of output values, and then mapping the output value to information used to identify the source[/destination] of each received packet to obtain an output value that can be used as an index into an allocation table of traffic managers (e.g., a table, list, file,*

*database, or the like of entries, with each entry including an identifier associated with one of*

*multiple traffic managers)*

The Court is mindful that this Claim Term is also a portion of Claim Term 10.2 (which simply adds "wherein the routing means…" to the front of the term). The Court therefore adopts a uniform construction of Claim Terms 5.3 and 10.2.

Defendant proposes the use of "source[/destination] address" in construing this term, but the Court is not persuaded. There are numerous instances in the Abstract and specifications of the 809 patent that "source[/destination] address" which demonstrate that, while "addresses" may be included within the term "information," the term "information" includes more than just "addresses." [1]

**Claim Term 5.4** **("the combination is determined by hashing at least one of the source IP address and port or the destination IP address and port to generate a hash key that is useable to determine the traffic manager"):** *applying a function to map the source[/destination] address, but without mapping the destination[/source] address, to an integer output that is used to select the first [/target] traffic manager*

With one small variation, the Court construes this term in the same fashion as Claim Term 5.1. The variation (the exclusion of the phrase "… and then sending the packet to the selected traffic manager") arises from the fact that, unlike Claim Term 5.1 (which discloses "distribut[ing]/forward[ing] the packet to" a selected traffic manager), this term merely recites

---

[1] "The IP address and port number are selected from source or destination information ('809 Patent, Abstract); "a distributor extracts information, such as source and destination IP addresses, and source and destination port numbers from the packet" (Id., 2:41-44).

that the integer output is "useable to determine the traffic manager." Therefore the Court's construction of 5.4 concludes with "mapping… to an integer output that is used to select the first/[target] traffic manager."

Plaintiff's proposed construction attempts to read the term phrase "at least one of the source IP address and port or the destination IP address and port" as "the source IP address and/or port number" and "the destination IP address and/or port number." Plaintiff's counsel contended at oral argument that this is "not an unreasonable construction" of this phrase. The Court cannot agree. Not only does it defy commonly accepted rules of syntax and grammar, but hashing on the port number alone finds no support in the specification or claim language of the '809 Patent. It is not permissible to "propose constructions that are not grounded in the specifications." C-W Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1378 (Fed. Cir. 2006). Furthermore, Plaintiff's construction is at odds with the testimony of its own expert. *See* Kesidis Depo. at 204:14-19.

**Claim Term 7** ("**determines the traffic manager based on whether at least one address that is included with a received packet is also associated with a set of addresses**"): *selects a traffic manager by determining that the packet includes an address that is contained in a predefined class of addresses*

Both parties agree that this term (which is contained within Claim Term 1 – e.g., '996 Patent Claim 1) involves the "if/then" condition of Claim Term 1. The Court simply construes Claim Term 7 consistently with the construction of Claim Term 1.1.

**Claim Term 8** ("distributor"): *A component that receives a packet or flow of packets, determines where a packet or flow of packets should be sent, and sends a packet or flow of packets toward their destination. A distributor is implemented in software and/or hardware.*

The differences in the parties' proposed constructions revolve around three points of disagreement regarding the patents' recitation of a "distributor." With two modifications (one suggested by Plaintiff at oral argument, another suggested by Defendant's responsive briefing), the Court adopts F5's proposed construction.

1. **"Component" v. "device"**: This distinction goes to the heart of the dispute between these parties – whether Plaintiff's patents disclose an invention which can exist as a component of a larger device (Plaintiff's position) or can only exist in a stand-alone device (as Defendants claim). The Court finds Plaintiff's position persuasive regarding this Claim Term.

Plaintiff's expert claims that "distributor" would be understood by a "person of ordinary skill in the art" as a component (either hardware or software) that "distributes packets."[2] Kesidis Decl., ¶¶ 61-62. More significantly, F5 cites to intrinsic evidence which supports this construction: language in the specifications establishing the nature of the "distributor" as a component. *See* '996 Patent 11:50-62 and Fig. 5 ("The system includes client **410**, distributor **505**, server **510**, traffic management devices **420-422**, and origin servers **440-442**… *Components* [in FIG. 5] numbered similarly to those in FIG. 4 operate similarly;" emphasis supplied); *id.* at 8:57-63 ("The software or hardware [associated with the distributor] may be logic circuitry or software executing on the

---

[2] The parties are in agreement the distributor "determines" the destination of the packets which it receives.

electronic device *upon which the distributor resides…;*" emphasis supplied); and *id.* at 20:58-60 ("… one or more distributors may be integrated with one or more traffic management devices and switch fabric").

Defendant's arguments to the contrary are not persuasive. Regarding the description of the distributor as a "component" at '996 Patent 11:50-62, A10 argues that, because the distributors in FIG. 4 and FIG. 5 are numbered *differently*, the specification does not refer to distributors as "components." That is not the way the specification reads – the reference clearly labels all the described items (client, distributor, server, traffic managers, origin servers) as "components," then goes on to say that those which are numbered similarly may be assumed to operate similarly. The fact that the distributors in the two figures are numbered differently simply means that Plaintiff cannot contend that they operate similarly – both distributors are still described as "components" by the specification.

A10 attempts to construe the '996 patent specification at 8:67-9:6 ("Exemplary devices that may be used to implement a distributor include…") as labeling the distributor a "device," but the Court finds this an overly restrictive reading. The specification describes a distributor as something that is *implemented* (i.e., "put into effect according to or by means of;" Random House Dictionary, 2011) by a device, which could just as easily disclose a distributor as a component of a larger device as a device itself. F5's construction is supported by the earlier language from that same specification ("The software or hardware [associated with the distributor] may be logic circuitry or software executing on the electronic device *upon which the distributor resides…;*" '996 Patent 8:60-63, emphasis supplied) which discloses the distributor as something that is a

*part* of a device; i.e., a component.  A10 wants to read "implemented" out of context – in the larger context of the specification, "distributor" is recited as a "component."

2. **"Software and/or hardware:"** The dispute regarding this portion of the proposed construction is part and parcel of the larger disagreement regarding whether the distributor must be construed as a stand-alone device; i.e., "[s]oftware has no utility without hardware to execute it."  Def. Responsive Briefing, p. 17.  But if (as the Court has found) a distributor can be a component, it certainly can be a "software component" of a larger system. Certainly it would need hardware to be effective, but the patents disclose a distributor which can be part of a system which would consist of hardware devices which could "implement" the distributor if it were simply a software component.

There is ample support in the specifications for the Court's "hardware and/or software" construction.  The '996 Patent recites that

> … it will be recognized by one skilled in the art that the functions and operation of the various embodiments disclosed may be implemented *in software, in firmware, in special purpose digital logic, or any combination thereof*…

'996 Patent, 21:31-34 (emphasis supplied).  "Upon receipt of a packet, *software and/or hardware associated with distributor 415* makes a determination as to where the packet should go."  Id. at  8:58-59 (emphasis supplied).

At oral argument, Plaintiff proposed a modification to their proposed construction in response to the Court's previous ruling concerning the proposal that "[a] distributor may be implemented in software and/or hardware."[3]  The Court accepts and adopts that

---

3 "If the apparatus "may" include hardware and/or software, presumably it may not include it, which produces an absurd result in a system that is clearly intended to function only in a networked computer environment."  Dkt. No. 119, Order on Claim Construction (Part 1), p. 20.

1    modification and construes the Claim Term to recite that "A distributor is implemented in

2    software and/or hardware." (emphasis supplied.)

3    3.  **"Over a computer network:"** Defendant has consistently maintained that the

4    distributors and traffic managers recited in Plaintiff's patents must exist in separate

5    devices which communicate "through" or "over" a computer network.

6         The Court is not persuaded that A10's proposed construction is supported by the

7    language of the Claim Terms in the patents at issue.  That claim language makes it clear

8    that the claims concerning distributors are not about packets being sent between client

9    and server devices (which would involve communication "over a computer network"),

10   but about packets being forwarded from distributors to traffic managers.  That is what the

11   patents disclose that distributors do and, having already ruled (*see* Dkt. No. 119, Order on

12   Claim Construction(Part 1), pp. 13-14) that the patents' use of the term "forward" is not

13   limited to transmissions "to a network device over a computer network" (as Defendant

14   proposed), the Court finds no reason to import that limitation here.

15        Defendant points to claim language that discloses "[a] distributor for distributing

16   flows of packets over a network" ('996 Patent, Claim 12) and "[a] system for distributing

17   flows of packets over a network" ('427 Patent, Claim 15).  A10's position is that this

18   definitively establishes that the forwarding process between distributors and traffic

19   managers occurs over a computer network.  The Court finds this a distorted reading of

20   that language: "over a network" simply describes where the packets (moving back and

21   forth between source and destination devices) travel; i.e., it is a description of the *entire*

22   system disclosed by the patents, not a limitation on the distributor – traffic manager

23   portion of that system.  Nothing in the claim language or specifications limits

24

communications between distributors and traffic managers to only occurring over a network.

The Court does adopt one argument propounded by Defendant concerning the construction of this Claim Term. A10 contends that the claim language only refers to the distribution of "flows of packets," and therefore does not support the use of the term "packets" in Plaintiff's proposed construction. Defendant challenges this as an impermissible broadening of the patent language. A review of the claims reveals that they recite sending both "flows of packets" ('996 Patent, 22:26-27; '427 Patent, 20:64, 21:28) and sending "a packet," "the packet" or "each packet" ('996 Patent 22:28, 34, 38, 42; 23:51-53, 57, 63;'427 Patent 21:10, 13, 42, 47) but not "packets." On that basis, the Court declines to incorporate "packets" into the construction and instead substitutes "a packet or flow of packets" as supported by the intrinsic evidence regarding this Claim Term.

**Claim Term 9.1 ("distributing [/distribution of] flows of packets over [/in] a network having [a plurality of network devices and] a plurality of traffic managers"):** *The Court finds that no construction is required for this preamble language.*

**Claim Term 9.2 ("distributing flows of packets over a network"):** *The Court finds that no construction is required for this preamble language.*

These terms comprise variations on language contained in the preambles of the patent claims cited in the Claim Terms. Unless certain conditions are met, preambles are not considered limitations and thus do not require construction. "[A] preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" Catalina Mktg Int'l, Inc. v.

Coolsavings.com, Inc. 289 F.3d 801, 808 (Fed. Cir. 2002)(quoting Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997)).

One test to determine whether the claim body describes a structurally complete invention is to read the claim without the preamble – if "deletion of the preamble phrase does not affect the structure or steps of the claimed invention," the preamble is not considered limiting. Id. at 809. Every claim cited in these two Claim Terms is unaffected in its completeness when read without the terms at issue here. The preambles simply describe a "purpose or intended use for the invention."

There are unquestionably cases where preambles have been found to contain limitations and thus require construction. In two cited by Defendant (Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615 (Fed. Cir. 1995) and Seachange Int'l, Inc. v. C-COR, Inc., 413 F.3d 1361 (Fed. Cir. 2005)), the preambles recited "a method for…" and the bodies of the claims of both patents then referenced the preambles through the phrases "*said* packet" and "*said* processor system." (emphasis supplied). This prompted the Federal Circuit to find that the preamble "provide[d] the only antecedent basis and thus the context essential to understand the meaning of" the method described in the claim body. Seachange, 413 F.3d at 1376. The '996 and '427 Patents contain no such specific reference back to any phrase used in the preambles in the Claim Terms at issue here. On that basis, the Court can make no finding that the "limitations in the body of the claim rely upon and derive antecedent basis from the preamble" such that the preamble "may act as a necessary component of the claimed invention." NTP, Inc. v. Research in Motion, Ltd., 418 F.3d 1282, 1306 (Fed. Cir. 2005).

The Federal Circuit (in Catalina Marketing) also cautions a reviewing court to look for "clear reliance on the preamble during prosecution to distinguish the claimed invention from the

prior art" as a sign that a preamble may constitute a claim limitation. 289 F.3d at 808. Defendant cites no such reliance in its briefing, nor can the Court find any. The Court thus finds it unnecessary to construe this preamble language.

**Claim Term 10.1/10.2** ("**means for routing each received packet to a corresponding traffic manager**"/ "**wherein the routing means determines the corresponding traffic manager based in part on hashing either source information or destination information in each received packet to determine a hash key useable as an index into an allocation table of traffic managers**"): *A transcoder including a traffic distribution engine for accessing a database, a table, or other information to select one of the multiple traffic managers based in part on applying a function for mapping a set of input values to a smaller set of output values, and then mapping the output value to information used to identify the source[/destination] of each received packet to obtain an output value that can be used as an index into an allocation table of traffic managers (e.g., a table, list, file, database, or the like of entries, with each entry including an identifier associated with one of multiple traffic managers).*

The parties agree that Claim Term 10.1 invokes the "means plus function" limitation of 35 U.S.C. § 112 ¶6 ("112(6)"):

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, materials, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, materials, or acts described in the specification and equivalents thereof.

Finding that the means-plus-function limitation has been invoked allows the patentee to generically identify a "structure" (i.e., "means") for performing the function described in the

claim, but thereafter limits the construction to whatever identified means appear in the specifications elsewhere in the patent.

"First, the court must identify the claimed function" as recited by the claim. <u>Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.</u>, 296 F.3d 1106, 1113 (Fed. Cir. 2002). The Court finds that the function performed by the "routing means" of Claim Term 10.1 includes "routing each received packet to a corresponding traffic manager." However, this is not the sum and substance of the function recited by these Claim Terms.

F5 seeks to differentiate the "wherein…" clauses of Claim 1 of the '809 Patent (Claim Terms 10.2 and 10.3) from the function enunciated in Claim Term 10.1. There is no support in the claim language or in logic for this differentiation. Each of these "wherein" clauses is unmistakably linked to the "means for routing each received packet to a corresponding traffic manager" and can only be read as reciting further delineations of the functions of the means announced in the claim language. F5's proposal to carve out these Claim Terms as simply describing "how" the function is performed is not supported by case authority, and appears to be "an improper [attempt] to broaden the scope of the claimed function by ignoring clear limitations in the claim language." <u>Cardiac Pacemakers</u>, 296 F.3d at 1113.

The claimed function of a means-plus-function element "must come from the claim language itself" (<u>Creo Prods., Inc. v. Prfesstek, Inc.</u>, 305 F.3d 1337, 1344 (Fed. Cir. 2002). The Court finds that a proper means-plus-function analysis dictates that the "wherein" clauses are the additional determining functions and must be construed in conjunction with Claim Term 10.1 to recite the entirety of the claimed function. The Court finds further support for this construction from the testimony of F5's own expert, who agreed that the "wherein" clauses recite the

functions performed by the means for routing. *See* Dkt. No. 106-4, Ex. 17, Kesidis Depo., 178:7-21 and 179:17 – 180:2.[4]

"[T]he court must then determine what structure, if any, disclosed in the specification corresponds to the claimed function." Cardiac Pacemakers, 296 F.3d at 1113. F5 maintains that the corresponding structure is "a central processing unit (CPU), an Application Specific Integrated Circuit (ASIC), a field-programmable gate array (FPGA), program code and data stored in memory, or any combination thereof, and may be logic circuitry or software executing on an electronic device, such as a processor" (Pltf Brief, p. 23), which it contends is adequate to demonstrate the means for sending packets to traffic managers. The Court cannot agree.

The CPU, ASIC, etc. listed in F5's proposed construction of Claim Term 10.1 are generic computer components. As discussed in Part 1 of this claim construction order, WMS Gaming, Inc. v. Int'l Game Technology, 184 F.3d 1339 (Fed. Cir. 1999) requires that

> [i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."

---

[4] Q. So looking at Paragraph B of claim 1 of the 809 patent, what is the function of that means?
A. Um, again, it's forwarding packets to traffic manager. Sending the packets to the traffic manager, and then it recites a -- additional details on how that will actually work.
Q. And what are these additional details you're referring to?
A. "Based, in part, on hashing either source information or destination information in each received packet to determine a hash key, usable as an index into an allocation table of traffic managers wherein a response packet to each received packet is forwarded to the same corresponding traffic manager." So it's a method and a condition.
**********
Q. Will you agree that when we're looking to identify the structure that performs this function, it means to perform the entire function, routing each received packet to a corresponding traffic manager, or in the routing means determines all the way down to the end of the claim?
A. Yes. Right.

Id. at 1349.  The "structure" identified by Plaintiff in its construction is insufficient to perform

the function of 10.1.  As the Federal Circuit held in Harris Corp. v. Ericsson Inc., 417 F.3d 1241,

1253 (Fed. Cir. 2005), "[a] computer-implemented means-plus-function term is limited to the

corresponding structure disclosed in the specification and equivalents thereof, and *the*

*corresponding structure is the algorithm*."  (Emphasis supplied.)

Furthermore, the specifications of the '809 Patent themselves do not support Plaintiff's

claim that they "disclose structural embodiments of the means for sending packets to traffic

managers" to include the generic computer components listed in its proposed construction.

Plaintiff Brief, p. 23.  At best, the specifications make rather vague and general references to the

ASIC chip "perform[ing] some of the functions of [a] network device" (4:48-49) or "a number of

packet processing functions" (4:50-51), and to the ASIC chip, the FPGA or the CPU performing

"a number of functions of the network device" (4:56-58).  The most specific reference asserts

that, "in one embodiment, the logic of the hash function **218** is performed by the ASIC chip."

4:51-53. "Performing the logic of the hash function" is only a portion of the function disclosed in

the claim language.

In the final analysis, none of Plaintiff's proposed elements satisfy the requirement that the

corresponding structure must be "clearly link[ed]" to the function recited in the claim.  B. Braun

Medical, Inc. v. Abbott Laboratories, 124 F.3d 1419, 1424 (Fed. Cir. 1997).  On that basis, the

Court cannot accept F5's proposed constructions for Claim Terms 10.1 – 10.3.

And although Plaintiff's expert criticizes Defendant's proposed construction on the

grounds that it "unnecessarily includes the 'process' for determining the traffic manager…"

(Dkt. No. 103, Kesidis Decl., ¶ 67), the "process" is exactly what WMS Gaming and Harris

Corp. describe as the "disclosed structure" in a computer-implemented invention; i.e., the "algorithm" by which the means accomplishes its function.

The Court's reasons for not adopting Plaintiff's construction of Claim Terms 10.1 – 10.3 have been discussed *supra.* The Court's construction adopts portions of Defendant's proposal with certain revisions intended to maintain consistency with the construction adopted for Claim Term 5.3 which (as previously mentioned) is the language which follows "wherein the routing means" in Claim Term 10.2.

The parties are in agreement that there is ample support in the specifications for identifying the "transcoder" as part of the corresponding structure used to accomplish the routing means' function. A10 seeks to add "including a traffic distribution engine (in the apparatus)" to the construction. The Court finds a recitation of a "traffic distribution engine" in the '809 specifications, which state: "*In one embodiment*, the transcoder includes traffic distribution engine **224** shown in FIG. **2**." 6:18-19 (emphasis supplied). Mindful of the admonition that "[a] patent claim should be construed to encompass at least one disclosed embodiment in the written description portion of the patent specification" (Johns Hopkins University v. CellPro, Inc., 152 F.3d 1342, 1347 (Fed. Cir. 1998)), that embodiment will be incorporated into this construction. However, the Court finds no support in the claim or specification language for inclusion of "(in the apparatus)" as proposed by Defendant.

The specifications do disclose that "[t]he transcoder may access *a database, a table, or other information* to determine an action to perform upon receipt of a packet" (6:19-20; emphasis supplied). However, a review of all the specifications cited by Defendant's expert in support of Defendant's construction reveals no mention of "pre-defined conditions," so the Court declines to append that phrase to the construction.

**Claim Term 10.3 ("wherein a response packet to each received packet is forwarded to the same corresponding traffic manager"):** *For every response packet to a received packet, a transcoder including a traffic distribution engine also accesses a database, a table, or other information to apply a function for mapping a set of input values to a smaller set of output values, and then mapping the output value to information used to identify the source[/destination] of each packet to obtain an output value in order to transmit every response packet to the same corresponding traffic manager to which the received packet was transmitted*

The Court separately construes Claim Term 10.3 to account for the fact that the additional determining function described by this language is the sending of packets received in response to a previous packet transmission to the same traffic manager to which the previous received packet was forwarded. While still part of the identified function ("routing each received packet to a corresponding traffic manager"), it is a sufficiently distinct part of the process to require a separate construction.

**Conclusion**

This concludes the Court's construction of the claim terms submitted by Plaintiff and Defendant. The parties are referred to the Case Scheduling Order (Dkt. No. 36) for the remaining pretrial events and deadlines.

The clerk is ordered to provide copies of this order to all counsel.

Dated August 9, 2011.

Marsha J. Pechman
United States District Judge